**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| TAFFEY GRAHAM, SCOTT GRAHAM, CHELSEA MCCRACKEN, BRANDON MCCRAKEN, and ALEXANDER KONOVALOV, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 3:24 C 50204<br><br>   Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chelsea and Brandon McCracken, Taffey and Scott Graham, and Alexander Konovalov bring this lawsuit as representatives of several putative classes of consumers who purchased allegedly defective lawnmowers and/or general purpose engines manufactured by Defendant American Honda Motor Co., Inc. ("Honda"). Plaintiffs have not alleged any physical injuries that resulted from the defects, but claim economic losses in that the products they purchased were worth less than Plaintiffs paid for them. Plaintiffs assert that Honda engaged in deceptive and/or misleading business practices by falsely representing that the lawnmowers (and engines) were safe and reliable. Plaintiffs collectively seek both injunctive relief and damages, based on their claims that Honda has breached the implied and/or express warranties associated with the lawnmowers; violated Illinois and New Jersey's consumer fraud statutes; and unjustly enriched itself at the Plaintiffs' expense.

Plaintiffs filed their initial complaint in this suit on May 30, 2024 [1]. After Honda moved to dismiss the initial complaint [17], Plaintiffs filed the operative, amended complaint on September 12, 2024 [22]. Honda has moved to dismiss the amended complaint [28] and, as explained below, the motion is granted in part and denied in part. The Grahams' and Konovalov's claims for

damages based on breach of express warranties survive this motion; all other claims asserted by Plaintiffs are dismissed without prejudice. If Plaintiffs intend to file a second amended complaint, they are directed to notify Honda and the court by September 28, 2025.

## BACKGROUND

Defendant is a corporation organized under California law, with its principal place of business in Torrance, California. (Compl. [22] ¶ 28.) Among other products, Defendant manufactures, markets, and sells two lines of lawnmowers, the HRN216 and HRX217, and two models of general purpose engines, the GCV 170 and GCV 200. (*Id.* ¶¶ 1, 5, 33, 34.) This case stems from a September 2023 recall of the aforementioned lawnmowers and engines issued to address a product defect. (*Id.* ¶¶ 6–10.)

Plaintiffs—the McCrackens, the Grahams, and Konovalov—all allege they purchased defective HRN216 or HRX217 lawnmowers from retailers (Lowes, Home Depot, and Amazon, respectively) between December 2, 2022 and June 13, 2023. (*Id.* ¶¶ 82, 84–85, 119, 132.) The Plaintiffs do not claim physical injuries as a result of the defect; rather, they seek compensation because their defective lawnmowers are "not worth as much as" they paid for them and because, they allege, they were duped into buying these lawnmowers by Honda's unlawful misrepresentations and omissions regarding the machines. (*Id.* ¶¶ 22–23.) Plaintiffs seek to represent several putative classes of consumers who also purchased either lawnmowers or general purpose engines affected by the recall (*see id.* ¶ 153) and assert that the court therefore has jurisdiction over their claims under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), *et seq.* (*Id.* ¶¶ 1, 29.)

Below, the court provides background on the lawnmowers, the defect, and the recall; recounts the Plaintiffs' general allegations regarding Honda's misconduct; details each set of individual Plaintiffs' allegations; and, finally, notes the allegations relevant to establishing subject matter jurisdiction under CAFA.

I.      **The Honda Products, the Defect and the Recall, and Honda's Alleged Misconduct**

Between May 2022 and June 2023, Honda developed, marketed, and sold a variety of HRN216 and HRX217 lawnmowers, which typically cost between $500 and $1,110.  (Compl. ¶ 33.)  Honda developed, marketed, and sold GCV 170 and 200 general purpose engines between June 2022 and August 2023; the engines typically cost between $370 and $550.[1]  (*Id.* ¶ 34.)

The HRN216 and HRX217 lawnmowers were the subject of a limited warranty offered by Honda.  All three sets of Plaintiffs, following their purchase of the lawnmowers from retailers, registered their products with Honda for the specific purpose of availing themselves of this warranty.  (*Id.* ¶¶ 82, 101, 130.)  Despite referencing the warranty in their complaint, the Plaintiffs have neither attached a copy of the warranty nor described its terms.  Honda has, however, attached a copy of the referenced warranty to its briefing on the instant motion.  (*See* Limited Warranty [28-2].)  Plaintiffs have not questioned the authenticity of the warranty document filed by Honda, and the court will consider it as part of pleadings under the incorporation-by-reference doctrine.  *See Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 663 (7th Cir. 2022).

The warranty states that Honda will "repair or replace, at its option, any part that is proven to be defective in material or workmanship under normal use during the applicable warranty time period."  (Limited Warranty at 1.)  According to the warranty, repairs and replacements "will be made without charge for parts or labor," but to obtain the warranty service, the owner must, at their own expense, take the product to a Honda Power Equipment dealer who "is authorized to sell and/or service that product."  (*Id.*)  The warranty does not apply to damage sustained from (among other things) neglect by the user, improper repair or maintenance, or normal wear and tear; the warranty further "disclaims any responsibility for loss of time or use of the product, transportation, commercial loss, or any other incidental or consequential damage."  (*Id.* at 2.)  The

---

[1]      The suitability of the named Plaintiffs as class representatives is not before the court at this juncture; the court notes, however, that none of the Plaintiffs are alleged to have purchased general purpose engines.

terms of the warranty apply to HRN216 series lawnmowers purchased for private residential use for 36 months from the date of retail purchase and HRX217 series lawnmowers purchased for private residential use for 60 months.  (*Id.* at 1.)  On its face, the warranty does not appear to apply to GCV 170 or GCV 200 general purpose engines.

On September 14, 2023, Honda issued a recall of the lawnmowers and engines.  (*Id.* ¶ 39.)  In a notice of the recall—attached to the complaint by Plaintiffs via hyperlink—Honda stated that "[d]ue to a manufacturing defect, the camshaft decompressor mechanism in the engine can malfunction, resulting in excessive force required to pull the recoil starter rope during engine starting."  (*Id.* ¶ 6 n.5 (hereinafter "Recall Notice").)  Specifically, the notice warns that the defect could cause "some users [to] experience a kickback of the recoil starter grip" of the lawnmowers or general purpose engines, "increasing the risk of injury," and that "[f]or units equipped with an electric starter, the starter motor may not be able to successfully start the engine."  (*Id.*)  Plaintiffs allege that the kickback creates "a risk of injury to the hand, fingers, arm, shoulder, and or/back." (Compl. ¶ 37.)

According to Honda's recall notice, only some of the lawnmowers and engines in the relevant product lines were affected by the defect.  (Recall Notice at 1.)  Plaintiffs refer to affected units as the "Noticed Products."  (*See, e.g.,* Compl. ¶¶ 1, 6, 37.)  With respect to the general purpose engines, the recall purported to list the serial numbers (whether in ranges or individually) of every affected unit—almost 50,000, by the court's count.  (*See* Recall Notice at 1.)  But with respect to the lawnmowers, the notice listed a much wider range of serial numbers—more than 700,000—while noting that not all of the lawnmowers within the serial number ranges were in fact affected, and that the recall was available only to consumers who could confirm that their mower suffered from the defect.  (*Id.*)  Any consumer who had registered their lawnmower with Honda was not required to take any steps to confirm their status; such consumers would receive a letter notifying them if their unit was affected.  (*Id.*)  Consumers who had not registered could confirm their lawnmower was affected either by visiting Honda's website and entering their machine's

4

serial number, by contacting a local authorized Honda service dealer, or by calling a toll-free recall line that Honda had set up for this purpose.[2]  (*Id.*)  The recall notice advised consumers whose lawnmower or engine was affected to stop using the product until it had been repaired by an authorized Honda dealer.  (*Id.*)

On the same day that Honda issued its recall notice, the U.S. Consumer Product Safety Commission ("CPSC") also issued an announcement of the recall.  The CPSC's announcement, also hyperlinked in Plaintiffs' complaint, reports that about 391,800 units in total (counting lawnmowers and general purpose engines) were affected by the recall.  (*See id.* ¶ 8 n.7 (hereinafter "CPSC Announcement")).  According to that announcement, Honda had "received 2,197 reports of incidents related to camshaft failures, including seven reports of minor injuries" before recalling the lawnmowers and engines.  (*Id.*)  The announcement also identifies the Honda recall as a "Fast Track Recall" (*id.*); the CPSC's website explains that

> [t]he Fast Track Recall Program helps consumers by removing potentially hazardous products from the marketplace as quickly and efficiently as possible and rewards businesses that act quickly.  To participate in this program, a business must be prepared to implement a corrective action plan – including a consumer-level recall (refund, repair, or replacement).  In addition, the firm must immediately stop sale and distribution of the product.

*CPSC Fast Track Recall Program*, U.S. CONSUMER PRODS. SAFETY COMM'N, https://www.cpsc.gov/Business--Manufacturing/Recall-Guidance/CPSC-Fast-Track-Recall-Program (last visited June 3, 2025).

Before Honda issued the recall notice, and without notifying customers, Honda had also sent a separate, "Stop Sale" notice to retailers on June 19, 2023.  (Compl. ¶ 5.)  This notice stated:

> [d]ue to the increase in claims related to camshaft decompressor malfunctions, and complaints from the market, Honda is conducting an in-depth investigation into the issue.  During this time, all HRN216 and HRX217K6 product in dealer and

---

[2]        Neither the face of the recall notice nor Honda's briefing make this clear, but the court presumes that Honda and its dealers had access to a database or list of every affected lawnmower's serial number, such that they could confirm that a particular consumer's lawnmower was affected if that consumer provided their product's serial number when communicating with Honda.

Honda inventory will be placed on hold and cannot be rented/retailed into the market.

(*Id.* ¶ 5 n.4 (hereinafter "Stop Sale Notice").)

Plaintiffs now assert that Honda, via its marketing and labeling of the Noticed Products, engaged in "deceptive, untrue, and misleading" representations of the products' reliability and safety. (*Id.* ¶ 65.) For example, Plaintiffs allege that, among other misrepresentations, Honda described its lawnmowers online by stating that the lawnmowers "will give you the best looking lawn on the block"; that they are "so easy to start and reliable, you call [them] 'Old Dependable'"; and that they make "the job less of a chore and more of a pleasure." (*Id.* at ¶ 32.) In making these representations, Plaintiffs assert, Honda "knowingly omitted" the fact that the Noticed Products at issue contained "a seriously dangerous defect," and "failed to recall the Noticed Products immediately once [Honda] became aware of the issue." (*Id.* ¶ 60.) Plaintiffs contend that Honda "chose to market the Noticed Products in this way to impact consumer choices and gain market share," and was "aware that all consumers who purchased the Noticed Products were exposed to and would be affected by its misrepresentations and omissions." (*Id.* ¶¶ 193, 208.)

Plaintiffs present two theories regarding when and how Honda became aware of a manufacturing defect in its products. First, Plaintiffs aver "on information and belief" that Honda discovered the defect before the lawnmowers and engines went to market (in May and June 2022), "but decided not to take any affirmative action to remedy the defect" until the September 2023 recall. (*Id.* ¶ 56.) This must have been the case, according to the complaint, because Honda is "a large, sophisticated company," is "experienced in designing and manufacturing engines and lawnmowers such as the Noticed Products," and "conducts pre-sale testing to verify the function and safety risks posed to users of the products." (*Id.*) In the alternative, Plaintiffs allege that Honda became aware of the decompressor defect once the lawnmowers and engines were already on the market but continued to sell them anyway. (*Id.* ¶ 55.) On this account, Honda

6

learned of the defect because it "regularly monitors consumer complaints submitted to the CPSC and responds to such complaints and inquiries," and became aware of "its manufacturing defect and safety risks" no later than June 19, 2023, the date on which Honda sent the Stop Sale notice to retailers.  (*Id.* ¶ 54.)

## II.    Named Plaintiffs' Allegations

### A.  The McCrackens

Plaintiffs Chelsea and Brandon McCracken, husband and wife, are residents of Moline, Illinois.  (Compl. ¶ 25.)  The McCrackens purchased an HRN216 lawnmower, serial number MANA-2178370, from a Lowes store in Moline on December 2, 2022, for $521.55.  (*Id.* ¶ 69.)  The serial number of the McCrackens' lawnmower is within the range identified in Honda's recall notice as being potentially defective.  The McCrackens allege that Lowes is "an authorized Honda dealer."  (*Id.*)  The McCrackens also allege, on information and belief, that Honda gave Lowes authority to bind Honda to statements made by Lowes regarding the safety and efficacy of the Noticed Products.  (*Id.* ¶ 172.)  Finally, the McCrackens assert that it was reasonable for them to believe Lowes was an agent of Honda because Lowes sold Honda lawnmowers; because representations about Honda's lawnmowers appeared on the Lowes website; and because Honda's lawnmower "product materials," including lists of replacement parts, assembly instructions, the limited warranty, and product manual, appeared on the Lowes website.  (*Id.* ¶ 174.)

Without describing specifics, Brandon McCracken alleges he "reviewed information about" the HRN216 lawnmower on its "packaging and labeling" prior to buying it and that he reviewed "information provided by" Honda regarding the lawnmower that was available on the Lowes website, as well as the representations made by Honda on its own website.  (*Id.* ¶¶ 72, 73.)  McCracken further alleges that one or both of these websites described the HRN216 lawnmower as "superior performance meets value"; as having a "power" engine; and as capable of "versatile"

7

use, leading him to believe he was purchasing a "premium, reliable, easy-to-use lawnmower." (*Id.* ¶¶ 75–77.)

Following their purchase, the McCrackens "registered their lawnmower directly with Honda for the purpose of availing themselves of the three-year warranty" offered by Honda. (*Id.* ¶ 82.) The McCrackens also purchased a three-year protection plan on the lawnmower from Lowes, for which they paid $134.97, (*id.* ¶ 7), but they do not describe the terms of this protection plan in the complaint or explain the extent to which those overlapped with the limited warranty offered by Honda, if at all.

The McCrackens now assert that they had "no opportunity" to review the warranty prior to purchasing their lawnmower, which in their view renders any exclusions or limitations of remedies contained in the warranty unconscionable and unenforceable. (*Id.* ¶ 174.) This allegation raises at least some questions: the McCrackens appear to be asserting that neither the packaging nor the labeling of the lawnmower nor Honda's website—both of which they claim to have reviewed prior to purchasing their lawnmower—contained any information regarding the lawnmower's warranty. At the same time, however, the McCrackens also allege that (1) they reviewed the information regarding the lawnmower available on Lowes's website prior to purchasing the machine, and (2) they believed Lowes was an agent of Honda's in part because the lawnmower's warranty was available to view on Lowes's website. (*Id.* ¶¶ 73, 172, 174; *see also* Opp. [31] at 7.) The allegation that the McCrackens had "no opportunity" to review the warranty prior to their purchase is not plausible. In any event, regardless of whether they reviewed the warranty before or after purchasing the product, the McCrackens did in fact register their lawnmower with Honda for the very purpose of availing themselves of the warranty, if necessary.

At some point in time (they do not say when), the McCrackens stopped using their lawnmower because it would not start, and because they had "been advised that it [was] unsafe for use and should not be used." (*Id.* ¶ 83.) They assert that the lawnmower would not start because it had a defective decompressor. (*Id.* ¶ 84.) With respect to the allegation that they were

advised that the lawnmower should not be used, it is unclear whether the McCrackens mean that they came across the recall notice, or that someone else gave them a warning. The McCrackens also do not say whether they received a letter from Honda notifying them that their lawnmower was affected by the recall, whether they attempted to contact Honda (or an authorized service dealer) to confirm that their lawnmower was affected, or whether they otherwise attempted to confirm what was wrong with their lawnmower.

The McCrackens have alleged that they "would continue to use" their lawnmower "if they were able to properly repair it to make it safe and useful," but assert that they "cannot repair it without undertaking extraordinary burden and expense." (*Id.* ¶ 87.) The court presumes the McCrackens mean that it would be extraordinarily burdensome and expensive for them *personally* to repair the lawnmower; they have not offered details that would allow the court to infer that taking the lawnmower to a repair shop would be so burdensome and costly. The McCrackens further urge that, "due to Honda's history of misrepresentations and omissions regarding the safety or efficacy of its lawnmowers and engines," they "cannot rely on Honda's purported remedy for the engine defect or avail themselves of the recall"; the court understands this to mean that the McCrackens do not trust Honda to fix their lawnmower properly. (*Id.* ¶¶ 88–89.) Because they cannot practicably have their lawnmower repaired, the McCrackens conclude, the lawnmower is now "worthless" or, at minimum, "substantially diminished in value." (*Id.* ¶ 86.) The McCrackens do not say whether they sought to avail themselves of the three-year protection plan on the lawnmower that they purchased from Lowes.

Had they known that the lawnmower was defective, the McCrackens allege, they "would not have purchased it or [would have] paid significantly less" for it. (*Id.* ¶ 85.) Finally, the McCrackens assert that they "face real and immediate threat of future injury in that they will need to use their mower to continue their lawn care, or suffer further damages related to the cost of landscaping and new lawn care equipment based on their inability to use" their lawnmower. (*Id.* ¶ 90.)

### B.  The Grahams

Plaintiffs Taffey and Scott Graham, husband and wife, are residents of Rockford, Illinois. (*Id.* ¶ 26.)  The Grahams purchased an HRN216 lawnmower, serial number MANA-2139178, from a Home Depot in Rockford on June 13, 2023 for $494.10.  (*Id.* ¶ 91.)  The serial number of the Grahams's lawnmower is within the range identified in Honda's recall notice.  Akin to the McCrackens' allegations concerning Lowes, the Grahams allege that Home Depot is an agent in part because the lawnmower's warranty was available on Home Depot's website.  (*See id.* ¶¶ 172–74.)

The Grahams assert that in purchasing their lawnmower, they relied on a representation on Home Depot's website stating that the HRN216 was "reliable" and had "easy starting power." (*Id.* ¶ 93.)  They also aver that before purchasing the lawnmower, they "reviewed information about it on its packaging and label," though, like the McCrackens, the Grahams do not say what that information was.  (*Id.* ¶ 97.)  The Grahams further allege that "[t]hey were concerned about the cost of the Honda lawnmower, feeling it was considerably more expensive than other options, but they relied upon Honda's reputation for quality products and the representations that the product would be easy for them to use"; the Grahams also say they relied on statements by an unnamed employee of the Home Depot in Rockford that the Honda lawnmower was "reliable and would be easy for them to use."  (*Id.* ¶¶ 95, 97)  Like the McCrackens, following their purchase of the lawnmower, the Grahams "registered their lawnmower directly with Defendant for the purpose of availing themselves of the three-year warranty."  (*Id.* ¶ 101.)  The Grahams, too, now assert that they had no opportunity to review the limited warranty prior to their purchase—a puzzling assertion, in light of their allegation that they believed Home Depot was an agent of Honda in part because the warranty was available to review on Home Depot's website.  (*Id.* ¶ 174.)

The Grahams have not alleged any difficulty in starting their lawnmower, nor having experienced a "kickback" on the starter grip when they began using the machine; indeed, they do not allege any problems with their lawnmower's performance at all prior to learning of the recall

on Facebook at some unspecified time.  (*See id.* at ¶ 102.)  The Grahams simply assert that despite having registered their lawnmower with Honda following the purchase, Honda did not send them a letter confirming that their lawnmower was affected or otherwise notify them of the recall.  (*Id.*)  Nonetheless, upon learning of the recall, the Grahams proceeded to "search[] for local repair shops that [were] able to repair a Honda lawnmower and came across DeKalb Implement Co. . . . which is 12 miles from their home."[3]  (*Id.* ¶ 103.)  The Grahams contacted DeKalb Implement (by what means, they do not say) and "were told that if they wanted their mower repaired, they would have to bring it in themselves."  (*Id.*)  The Grahams do not describe whether they sought to confirm with Honda that their lawnmower was affected by the recall before seeking repairs or otherwise explain why they sought repairs despite (apparently) having no problems with their lawnmower's performance to that point.

The Grahams delivered their lawnmower to DeKalb Implement Co. (hereinafter "DeKalb Implement") in Rockford on December 6th, 2023[4] but do not allege that anyone at DeKalb Implement mentioned the recall or commented on the camshaft decompressor at this visit.  The Grahams do allege that a mechanic told them their lawnmower needed an "extensive repair" that "required taking the entire machine apart," and that "people would be killed" if the machine remained in its current condition.  (*Id.* ¶ 106.)  After DeKalb Implement returned the lawnmower to the Grahams in March 2024, they used it at their residence on "several uneventful" occasions.  (*Id.* ¶ 107–08.)  But one day—the Grahams do not say when—Taffey Graham began mowing the lawn at home only to notice a "grinding" sound coming from the lawnmower.  (*Id.* ¶ 108.)  The

---

[3]     Defendant's website lists DeKalb Implement as being authorized to service Honda lawnmowers.  *See Dealer Locator*, Honda, https://powerequipment.honda.com/dealer-locator/#:~:text=Find%20your%20local%20Honda%20Power%20Equipment%20dealer.%20Aut horized,Lawn%20mowers%2C%20Tillers%2C%20Trimmers%2C%20Snow%20blowers%2C%2 0%26%20Pumps (last visited September 3, 2025).

[4]     Though the Grahams do not seek damages on this ground, they explain that the effort of pushing the lawnmower onto a trailer, hitching that trailer to the Grahams' car, and driving 12 miles to DeKalb Implement caused the 66-year-old Scott Graham to aggravate an existing back injury.  (Compl. ¶¶ 104–105.)

lawnmower then began to emit smoke, "and all of a sudden metal pieces began to fly out of the lawnmower," almost striking Taffey. (*Id.*)

At some point after the explosive incident described above, the Grahams contacted Honda's Power Equipment Division to report the explosion, and "were advised" (presumably, by a Honda employee) that "the engine likely blew" and "to again take the lawnmower to an authorized dealer for repair." (*Id.* ¶ 109.) There is no allegation that the Honda employee mentioned the recall or confirmed that the Grahams' lawnmower was affected by it. The Grahams requested that Honda provide them with a new lawnmower at no cost and were told that Honda does "not do that." (*Id.* ¶¶ 109–111.) At some later date, the Grahams took their lawnmower to DeKalb Implement once more; during this visit, the Grahams say, a mechanic told them the lawnmower's failure had been "the result of the camshaft" and advised them "that it would require a new motor." (*Id.* ¶¶ 112–13.)

On or about August 13, 2024, Taffey Graham contacted DeKalb Implement to inquire as to the status of the repairs and learned from someone at DeKalb Implement "that Honda did not authorize" DeKalb Implement to repair the lawnmower. (*Id.* ¶ 114.) It is unclear whether the Grahams mean that Honda refused to pay for the repair, or that Honda warned that DeKalb Implement was not an authorized service dealer. Taffey Graham then contacted Honda (again, it is unclear by what means or on what date) "to try to get authorization for the repair of her lawnmower, particularly given that the lawnmower was still within the three-year warranty period." (*Id.* ¶ 115.) But a Honda employee named "Lauren" told the Grahams in response on August 20, 2024 that the lawnmower's malfunction "must have been due to low oil" and refused to authorize a repair. (*Id.* ¶ 116.) The Grahams deny that the lawnmower was low on oil at the time that it allegedly began to emit smoke. (*Id.* ¶¶ 117.)

Like the McCrackens, the Grahams allege that their lawnmower is now either "worthless" or "substantially diminished in value"; that had they known about the defect in the lawnmower, "they would not have purchased it or paid significantly less for it"; and that they "face real and

immediate threat of future injury in that they will need to use their mower to continue their lawn care, or suffer further damages related to the cost of landscaping and new lawn care equipment based on their inability to use" their lawnmower. (*Id.* ¶¶ 119–120, 122.) Also like the McCrackens, the Grahams assert that "due to Honda's history of misrepresentations and omissions regarding the safety and efficacy of its lawnmowers and engines, Plaintiff cannot rely on any of Honda's representations of safety and the comprehensiveness of warnings in the future." (*Id.* ¶ 121.)

### C. Konovalov

Plaintiff Alexander Konovalov is a resident of Basking Ridge, New Jersey. (*Id.* ¶ 27.) Konovalov purchased an HRX217 lawnmower, serial number MAMA-1679615, online via Amazon for $999.00 on May 22, 2023. (*Id.* ¶ 123.) This serial number is within the range listed in Honda's recall notice.

Konovalov alleges that prior to purchasing the lawnmower, he "reviewed information about the Noticed Product on Honda's website, https://powerequipment.honda.com, and believed based on the representations therein that he was buying a high-quality lawnmower that would last a long time." (*Id.* ¶ 125.) After purchasing the lawnmower, Konovalov registered it with Honda for the purpose of availing himself of the five-year warranty. (*Id.* ¶ 130.) Like the McCrackens and Grahams (*see supra* at 6–7, 9), Konovalov alleges he did not have the opportunity to review the warranty before making his purchase. (*Id.* ¶ 174.) Unlike his co-Plaintiffs, this allegation on Konovalov's part is not contradicted by his other allegations. Nonetheless, it is plain enough that once he was able to review the warranty, Konovalov registered his lawnmower with Honda specifically so that he could avail himself of the warranty.

When Konovalov first began to use his new lawnmower, "he found that it was very difficult to pull the recoil starter rope during engine starting, so much so that he was fearful he would break the lawnmower." (*Id.* ¶ 131.) Konovalov was nevertheless able to use the lawnmower to mow his lawn during the summer of 2023. (*Id.*) When Honda notified him of the recall at some point in November 2023, Konovalov "learned" (he does not say specifically how) "that the difficulty he

13

experienced trying to pull the recoil starter rope was due to a defect with the camshaft decompressor and that it posed a safety risk to him." (*Id.* ¶ 132.) Having learned of the defect, Konovalov "took his lawnmower to a local repair shop which advised him that their owner or parent company was an authorized Honda repair shop," but the shop was unable to repair the lawnmower because it did not have the appropriate replacement parts. (*Id.* ¶ 133.) On May 4, 2024, Konovalov took his lawnmower to a different, authorized repair dealer, Power Place, Inc., in Whitehouse Station, New Jersey. (*Id.* ¶ 134.) Konovalov alleges that a mechanic at Power Place "discovered metal parts" upon opening Konovalov's lawnmower for inspection—presumably, Konovalov means that the mechanic discovered loose or broken parts within the lawnmower. (*Id.* ¶ 135.) Konovalov does not say whether the mechanic at Power Place made any diagnosis as to the camshaft decompressor mechanism in the lawnmower.

Konovalov retrieved his lawnmower from Power Place on July 5, 2024; but one week later, while using the lawnmower, he observed that the machine was "emitting white smoke." (*Id.* ¶¶ 137, 139.) Konovalov then contacted Honda to complain about the condition of his lawnmower and "was advised" (presumably by a Honda employee) "that the lawnmower was continuing to suffer from an engine defect and that he should again bring it for repair to an authorized dealer." (*Id.* ¶ 140.) Konovalov again took his lawnmower to Power Place for repairs on July 20, 2024, and learned at this time that "a cylinder provided by Honda to remedy the defect scuffed the piston and ultimately resulted in the damage." (*Id.* ¶¶ 141–42.) A Power Place employee also told him that "the difficulty in executing this repair stemmed from the fact that the engines are no longer manufactured, and as such the repair requires dealers to effectively rebuild the engine from parts." (*Id.* ¶ 142.) At some point after this July 20 visit to Power Place, Konovalov contacted Honda and demanded a replacement engine; Honda "agreed and shipped replacement parts" to Power Place "for an engine rebuild." (*Id.* ¶ 143.)

Konovalov got his lawnmower back from the second round of repairs at Power Place on August 24, 2024. (*Id.* ¶ 144.) He alleges that between May 4 and August 4, 2024, he was able

to use his lawnmower only once and incurred $600 in lawncare expenses over the course of that summer.  (*Id.* ¶¶ 145–146.)  Konovalov has not alleged any problem with the lawnmower since August 2024 but asserts that he is now "fearful for his own safety" and "faces real and immediate threat of future injury in that he will need to use his mower to continue [his] lawn care, or suffer further damages related to the cost of landscaping and new lawn care equipment based on the continued risk of inability to use [his lawnmower]."  (*Id.* ¶ 148.)

## III.  CAFA Allegations

CAFA expands jurisdiction for diversity class actions by creating federal subject matter jurisdiction if (1) the class has 100 or more members; (2) at least one class member is diverse from at least one defendant ("minimal diversity"); and (3) there is more than $5 million, exclusive of interest and costs, in controversy in the aggregate.  *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017) (citing 28 U.S.C. §§1332(d)(2), (5)).

Plaintiffs allege that the number of potential class members is at or around 391,800, which is the total number of units affected by the recall, as stated in the CPSC's September 2023 announcement.  (Compl. ¶ 156.)  There is minimal diversity: Defendant Honda is a California corporation with its principal place of business in that state, the McCrackens and Grahams are residents of Illinois, and Konovalov is a resident of New Jersey.  Finally, Plaintiffs assert, also based on the CPSC's announcement, that the affected lawnmowers were typically sold for between $550 and $1,100 (though the Grahams and McCrackens allegedly paid only about $500 for theirs), and that affected general purpose engines sold for between $370 and $550.  (*Id.* ¶ 15.)  Even assuming that every allegedly affected unit sold for $370 (the price of the cheapest engines), the amount in controversy would be approximately $145 million, given that the Plaintiffs (or at least, the Grahams and McCrackens) allege that their lawnmowers have become worthless.

## DISCUSSION

All Plaintiffs bring claims against Honda for breach of express warranty (Counts V and VI). (Compl. at 44, 48.)  The McCrackens and Grahams bring additional claims for breach of the

implied warranty of merchantability (Count I), violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505-1, *et seq.* ("ICFA") (Count II), and unjust enrichment (Count IV). (Compl. at 32, 36, 42.) Konovalov brings an additional claim under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1, *et seq.* ("NJCFA") (Count III). (Compl. at 40.) All Plaintiffs seek damages, equitable relief in the form of disgorgement and/or restitution, and an injunction against Honda to (a) "enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices" alleged in the complaint, and (b) require it to "fully and adequately disclose the safety risks associated with the Noticed Products to anyone who may still be at risk of buying and using the noticed products." (Compl. at 53.)

Honda has moved to dismiss all of Plaintiffs' claims for failure to state a claim under Rule 12(b)(6). (Mem. [29] at 1.) To the extent Plaintiffs seek injunctive relief, Honda has moved to dismiss those claims for lack of subject matter jurisdiction under Rule 12(b)(1), arguing that Plaintiffs lack standing to seek that relief. (*Id.*); *see also Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1057 (7th Cir. 2018) ("Standing is an element of subject-matter jurisdiction in a federal civil action") (citation omitted).

## I.     Legal Standards

In examining Honda's motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the complaint and draws reasonable inferences in favor of the Plaintiffs. *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022) (citation omitted). Legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to a presumption of truth, however, *id.* (citations omitted), and a complaint "must give enough details about the subject-matter of the case to present a story that holds together." *Catinella v. Cnty. of Cook, Illinois*, 881 F.3d 514, 517 (7th Cir. 2018) (citation omitted).

Defendants may challenge subject matter jurisdiction under Rule 12(b)(1) in two ways. A "factual challenge" contends that "there is *in fact* no subject matter jurisdiction," even if the pleadings are formally sufficient, while a "facial challenge" argues the plaintiff has not sufficiently

"*alleged* a basis of subject matter jurisdiction." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citations omitted). Here, Honda appears to level a facial challenge to Plaintiffs' standing to sue for injunctive relief, arguing that Plaintiffs have failed to plausibly allege that the injunctive relief they seek will redress their injuries. (Mem. at 20.) Facial challenges to subject matter jurisdiction at the pleading stage are reviewed under the 12(b)(6) standard. *Silha*, 807 F.3d at 173.

## II.    Standing

As the party invoking federal jurisdiction, the Plaintiffs bear "the burden of establishing the elements of Article III standing." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024) (citation omitted). The three elements of standing are familiar: (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) likely to be redressed by a favorable decision. *Id.* (citation omitted). Plaintiffs in this case seek both legal and equitable relief.

### A.  Injunctive Relief

Plaintiffs seeking prospective injunctive relief have standing only if they face a "real and immediate" threat of future injury as opposed to a threat that is merely "conjectural or hypothetical*." Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citations omitted). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (citations omitted).

The named Plaintiffs allege they face a "real and immediate threat of future injury" in that continued inability to use their Honda lawnmowers will require them to either buy a new mower or pay someone else to mow their lawn. The court is not persuaded. Konovalov does not allege he has had any problems with his lawnmower since he got it back from the second round of repairs at Power Place and does not otherwise allege any facts from which the court can reasonably infer that the second repair was unsuccessful, or that the lawnmower will otherwise

17

malfunction again. Neither Konovalov nor the other Plaintiffs can establish a future injury simply by hypothesizing that their lawnmowers will malfunction in the future because Honda previously misrepresented the reliability of the machines. The threat of Konovalov being unable to use his lawnmower is too conjectural at this point to support a claim for injunctive relief.

The Grahams and McCrackens do allege that they are currently unable to use their lawnmowers, but this does not change the outcome of the inquiry. The McCrackens are asking for injunctive relief despite the fact that they have not sought the repair or replacement of their lawnmower at Honda's expense, as offered under the warranty and recall. This is an attempt to "manufacture standing" that the court cannot allow. *See Sugasawara v. Ford Motor Co.*, No. 18 C 06159-LHK, 2019 WL 3945105, at *6 (N.D. Cal. Aug. 21, 2019) (plaintiff, the owner of a Ford truck that he alleged was defective, could not allege future injury traceable to Ford's conduct where plaintiff failed to avail himself of recall remedy). The McCrackens appear to have declined to seek the remedy because they do not trust Honda, given its history of misrepresenting the safety and efficacy of its products. But this amounts to conjecture about the outcome of seeking the remedy based solely on Honda's past, allegedly unlawful misrepresentations or omissions. The McCrackens also suggest that seeking the remedy would have been futile because some consumers somewhere faced wait times as long as eight weeks to have their lawnmowers replaced. (*See* Compl. ¶ 48). But even a delayed repair, if successful, would cure the future injury of being unable to use the lawnmower.

That leaves the Grahams, who allege that, despite taking their lawnmower to DeKalb Implement for a round of repairs, their lawnmower suffered an explosive failure that left it severely damaged, and that Honda has refused either to issue them a replacement lawnmower or to authorize a second round of repairs. These allegations establish a real and immediate threat that the Grahams will be unable to use their Honda lawnmower moving forward, forcing the Grahams to buy another mower or else pay for lawncare. That threat of future injury is also fairly traceable (at least in part) to Honda's refusal to repair or replace the lawnmower. Nonetheless, the court

agrees with Honda that the injunctive relief the Grahams seek would redress this injury. (*See* Mem. at 20.)

The Grahams do not seek an order requiring Honda to authorize a second round of repairs for the Grahams' lawnmower. Instead, the Grahams request an injunction preventing Honda from misrepresenting the safety and quality of its lawnmowers and engines and/or concealing the existence of product defects in the future. As Plaintiffs' brief in opposition to the instant motion puts it, "the need for injunctive relief" is that "they can no longer rely on Defendant's representations." (Opp. at 20.) Even supposing an injunction would enable the Grahams to rely on Honda's representations moving forward, the Grahams have not explained what effect this would have on their own ability to use their severely damaged lawnmower. The injunctive relief the Grahams seek is not likely to redress the claimed future injury.

### B. Damages and Economic Injury

Honda has not contested Plaintiffs' standing to pursue claims for damages, but the court recognizes its independent obligation to verify that Plaintiffs meet this requirement. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 281 (7th Cir. 2020). Plaintiffs do not allege any physical injuries; rather, they claim economic losses. "Economic harm can be a concrete injury sufficient to confer standing." *In re Recalled Abbott Infant Formula*, 97 F.4th at 529 (citation omitted). That includes when, "as a result of a deceptive act or an unfair practice," a plaintiff is "deprived of the benefit of his bargain." *Id.* (citations omitted).

The court is satisfied that Konovalov has alleged a financial injury fairly traceable to Honda's conduct. Although his lawnmower was ultimately fixed pursuant to Honda's warranty and/or recall, it took Konovalov's local repair shop two tries over three months during the summer of 2024 to solve the problem, partially owing to the fact that a part Honda sent the shop to use in the initial repair ended up causing even more damage to the machine. In the interim, Konovalov alleges he accumulated $600 in lawncare costs. That loss is enough to give Konovalov standing

to sue, though as the court will discuss below, whether Konovalov is entitled to recover those costs on the merits is a different issue.

Whether the Grahams and McCrackens have standing based on economic injuries is a more complicated question. These Plaintiffs allege that they did not receive the benefit of their bargain because they would not have purchased the lawnmowers at all, or would have paid less for them, had they known of the supposedly concealed camshaft decompressor defect in the products. This is commonly known as the "price premium" or "premium price" theory of injury. *See, e.g., Calchi v. TopCo Assocs., LLC*, 752 F.Supp.3d 955, 974 (N.D. Ill. 2024); *Sanchez v. Walmart Inc.*, 733 F. Supp. 3d 653, 666 (N.D. Ill. 2024).

The leading Seventh Circuit case addressing this theory is *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011). Aqua Dots were a children's toy "consisting of small-brightly colored beads" that could be "fused into designs when sprayed with water." *Id.* at 749. The beads bore a "resemblance to candy" and contained an adhesive that was toxic when children ingested them, as some children did. *Id.* at 749–50. The Seventh Circuit held that the plaintiffs, parents of children who had *not* suffered physical injuries from swallowing Aqua Dots, nonetheless alleged a financial injury where they stated that "they paid more for the toys than they would have, had they known of the risks the beads posed to children." *Id.* at 751. A common variant on the price-premium theory in the years since *In re Aqua Dots* has seen consumers allege they did not get what they paid for, not because the product presented a risk of injury, but because the product did not perform to specifications that its seller or manufacturer represented. *See, e.g. Muir v. Playtex Prods.*, 983 F. Supp. 2d 980, 985–86 (N.D. Ill. 2013) (plaintiff purchased a diaper disposal product that had been advertised as "Proven #1 in Odor Control," a claim plaintiff plausibly alleged was demonstrably false); *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 693–94 (N.D. Ill. 2020) (plaintiff purchased a portable charger that was advertised as delivering a certain amount of power but later shown to deliver only two-thirds that amount).

20

The Grahams and McCrackens allege that they did not get what they paid for both because the lawnmowers were more dangerous than advertised and because they failed to live up to Honda's affirmations regarding their quality, particularly with respect to their reliability and how easy they were to start. But here, unlike in the cases described above, the manufacturing defect that the Plaintiffs say deprived them of the benefit of the bargain was subject to both a repair or replacement remedy in the lawnmowers' limited warranty, and to the later recall by Honda. This makes a difference.

As the Seventh Circuit explained in *S. Fin. Grp., LLC v. McFarland State Bank*, from the buyer's standpoint, the purpose of a "repair or replacement" remedy is to give the buyer goods that "conform to the contract" and are "substantially free of defects within a reasonable time after a defect is discovered." 763 F.3d 735, 741 (7th Cir. 2014) (citations omitted). Where such a remedy is part of the bargain, the buyer loses the benefit of their bargain for the goods only where the seller fails to honor the repair or replacement remedy, either because they are unable or unwilling "to repair or replace in a reasonable amount of time." *Id.* (citing DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 72 (2010)).

The Grahams aver they brought their defective lawnmower to a local shop to be repaired under the warranty and/or recall but that their lawnmower suffered a spectacular failure afterwards. Honda then refused to replace the Grahams' seriously damaged lawnmower or authorize another round of repairs. The Grahams have sufficiently alleged that the repair or replacement remedy has failed to provide them with a conforming lawnmower, denying them the benefit of their bargain.

The McCrackens' situation is different. The McCrackens have declined to seek the repair or replacement remedy. To the best of this court's knowledge, the Seventh Circuit has not addressed what effect the failure to seek the remedy might have on standing in this scenario. But several federal courts have held that a consumer lacks standing to pursue a price-premium theory where an adequate repair or replacement remedy exists, either under a warranty or recall, but the

consumer chooses not to pursue it. *See, e.g., Tarsio v. FCA US LLC*, No. 22 C 9993 (NSR), 2024 WL 1514211, at *4 (S.D.N.Y. Apr. 8, 2024) (plaintiff alleged he overpaid for a Ram truck because the defendant concealed the existence of a defect; no injury where the defendant provided an adequate remedy through a recall); *Kommer v. Ford Motor Co.*, No. 1:17 C 296 (LEK/DJS), 2017 WL 3251598, at *5 (N.D.N.Y. July 28, 2017) (plaintiff who alleged he overpaid for a defective Ford truck had a "perfectly adequate remedy available to him" under the truck's warranty, which "defeat[ed] his price-premium theory of injury"); *Comes v. Harbor Freight Tools USA, Inc.*, No. 20 C 5451-DMG (KKX), 2021 WL 6618816, at *5 (C.D. Cal. Sept. 29, 2021) (plaintiff whose alleged injury amounted "to the money he paid for" a defective jack stand[5] lacked standing where he chose not to pursue a recall remedy that would redress his injury); *Sugasawara*, 2019 WL 3945105, at *6 (plaintiffs who alleged they overpaid for a defective Ford truck had "not articulated any plausible theory of economic loss" where they failed to allege their vehicles' defect remained after Ford's recall remedy had been completed).

This court finds the reasoning of *Sugasawara v. Ford Motor Co.* persuasive and adopts it here. As the court there explained, a consumer who purchases a defective product may well have been injured at the time of that purchase: after all, a product "with a defect is worth less than one without a defect." 2019 WL 3945105, at *6 (citation omitted). But where a post-remedy product performs as it would without the defect, the product's value has likewise been restored. *Id.* It follows that when consumers choose not to avail themselves of an adequate repair or replacement remedy, their economic injury—a product that is worth less than what they paid for— is no longer fairly traceable to the manufacturer's alleged wrongdoing but rather to the consumer's choice. *Id.* at *6–7; *accord Comes*, 2021 WL 6618816, at *5.

---

[5]        A jack stand is a tool "used to secure automobiles in an elevated position and allow persons to make repairs underneath." *Comes*, 2021 WL 6618816, at *2.

The analysis might be different if the McCrackens had alleged specific facts that, if proved, would demonstrate that the repair or replacement remedy would not have cured the defect. But here, the McCrackens offer no more than a conclusory allegation that the remedy was inadequate because it was offered by Honda, whom the McCrackens accuse of having previously misrepresented the quality of the lawnmowers.

The McCrackens' claims for damages are dismissed for lack of standing.

## III.  Merits

The court now considers the merits of the Grahams' and Konovalov's claims for damages.

### A.  Graham Claims

#### 1.    ICFA Claims

The Grahams assert that Honda engaged in either deceptive or unfair conduct or both in violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA").  "These are separate categories; deceptive conduct is distinct from unfair conduct." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).  To state a claim under the ICFA based on "deceptive conduct," a private party must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶ 26, 241 N.E.3d 454, 461–62.  Illinois courts determine whether a defendant's conduct is "unfair" under the ICFA on a case-by-case basis, considering whether "the practice offends public policy, whether it is oppressive, and whether it causes consumers substantial injury." *Demitro v. Gen. Motors Acceptance Corp.*, 388 Ill. App. 3d 15, 20, 902 N.E.2d 1163, 1168 (1st Dist. 2009) (citations omitted).

A deceptive practices claim under the ICFA must meet Rule 9(b)'s heightened pleading standard, while an unfair practices claim need not. *Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th Cir. 2024) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014)).  But

plaintiffs may not avoid application of the Rule 9(b) standard simply by attaching language of "unfairness" to allegations that are "clearly premised upon" a primary claim of fraud. *Camasta*, 761 F.3d at 737; *see also Kahn*, 107 F.4th at 601 ("[t]he applicable pleading standard does not turn on a formalistic invocation of the word "unfair.")  The applicable pleading standard thus depends on whether the plaintiff's factual allegations "sound[] in fraud"; that is, whether they are "premised upon a course of fraudulent conduct."[6]  *Kahn*, 107 F.4th at 601–02 (citing *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)).

Here, Defendant argues that the Grahams have simply attached the label of "unfair" to their allegations of deceptive conduct in an attempt to state a claim that dodges the heightened pleading standard of Rule 9(b).  (Mem. at 9.)  The Grahams insist that "Defendant's attempt to graft the ICFA's pleading requirements for deceptive conduct onto Plaintiffs' allegations that Defendant also engaged in unfair conduct is improper and should be rejected by this court."  (Opp. at 8.)  Defendant has the better of this argument.

Plaintiffs, including the Grahams, have alleged that Honda knowingly concealed the existence of a defect in its lawnmowers and general purpose engines and continued to market and sell them anyway, and that it chose to engage in such "deceptive, untrue, and misleading" business practices in order to affect consumer choices and gain market share.  These are allegations sounding in fraud.  That the Grahams insist these misrepresentations constitute *both* unfair *and* deceptive conduct under Illinois law is of no moment; a "bare assertion of unfairness without describing in what manner" the conduct either violates public policy or is oppressive "is

---

[6]    To the best of this court's knowledge, the Seventh Circuit has not issued a detailed explanation of what it means for allegations to "sound in fraud"; but "[a]t bottom, the 'basic conduct' that common law fraud targets is 'misrepresenting or concealing material facts.'"  *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1294, 1295 (11th Cir. 2025) (quoting *SEC v. Jarkesy*, 603 U.S. 109, 125 (2024)); *see also Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (determining that allegations sounded in fraud because "the wording and imputations of the complaint" were "classically associated with fraud," accusing the defendant of making statements described as "inaccurate *and* misleading," containing *untrue* statements of material facts," and being "materially *false* and *misleading*.")

insufficient to state a cause of action." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 419, 421, 775 N.E.2d 951, 963 (2002). In this case, the Grahams have offered no articulation of what would make Honda's alleged conduct oppressive or violative of public policy other than being deceptive.

Because the Grahams' ICFA claims sound in fraud, those claims are analyzed under Rule 9(b)'s heightened pleading standard. To satisfy Rule 9(b), plaintiffs must use some "means of injecting precision" and some "measure of substantiation into their allegations of fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (citations omitted); *see also Camasta*, 761 F.3d at 737 (pleading fraud "ordinarily requires describing the who, what, when, where, and how of the fraud") (citation omitted). The heightened pleading standard "compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless," and "forces the plaintiff to conduct a careful pretrial investigation," thus operating "as a screen against spurious fraud claims." *Presser*, 836 F.3d at 776 (citation omitted).

Plaintiffs present two accounts of how and why Honda's sale and marketing of its lawnmowers and engines amounted to deception. First, Plaintiffs assert on information and belief that Honda knew the lawnmowers and/or general purpose engines were defective before the products even went to market but nevertheless released them to the public and marketed them as safe and reliable. In the alternative, Plaintiffs allege that after the lawnmowers and engines went to market, Honda's own monitoring of consumer complaints submitted to the CPSC alerted Honda that the products were defective, but Honda failed to notify the public for about three months after it had that information—no later than June 2023, when Honda issued the Stop Sale notice.

Plaintiffs' first theory of fraud does not meet the Rule 9(b) standard. That Plaintiffs allege these facts on "information and belief" is not necessarily fatal: though this practice is generally disfavored, it is permissible where (1) the facts constituting the fraud are not accessible to the

plaintiff and (2) the plaintiff provides "the grounds for his suspicions." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (citations omitted). In this case, at least *some* of the facts Plaintiffs would need to ultimately prove the supposed fraud—the details of Honda's manufacturing and testing processes, for example—would not be accessible to Plaintiffs without discovery. But the grounds on which Plaintiffs base their suspicions are too speculative to state a claim for fraud.

Plaintiffs effectively propose that for a class of "sophisticated" manufacturers, there is no such thing as an accident or an oversight in product liability cases: the reasoning goes that because (a) these manufacturers conduct pre-market product safety tests and (b) safety tests reveal defects, it follows that (c) any defective products that went out the door did so with the manufacturer's knowledge of the defect. Plaintiffs present no case in which a court has accepted such a sweeping argument, even at the pleading stage. Neither do they suggest that there is anything about these lawnmowers or about camshaft decompression mechanisms specifically that would make defects especially likely to be detected by safety testing. It may well be reasonable for the Plaintiffs to question how Honda missed the defects during product testing, but the particularity requirement of Rule 9(b) is designed precisely to discourage a "sue first, ask questions later" philosophy to fraud allegations. *Pirelli*, 631 F.3d at 441 (quoting *Berman v. Richford Indus., Inc.,* No. 78 C 54, 1978 WL 1104, at *5 (S.D.N.Y. July 28, 1978)).

Plaintiff's second fraud theory focuses on the Stop Sale notice that Honda issued to its retail partners on June 19, 2023 (six days after the Grahams purchased their lawnmower). If Honda knew enough about a potential defect to issue a Stop Sale notice to dealers, Plaintiffs urge, its failure to notify consumers at the same time constitutes a fraudulent omission regarding the safety and reliability of the products. To the court's knowledge, the Seventh Circuit has not addressed how the issuance of such a "Stop Sale" notice prior to a full-blown recall might bear on allegations of fraud by a manufacturer; nor have the parties offered case law on the issue. But this theory appears to satisfy the requirements that Plaintiffs identify the "who" (the relevant actors

within Honda[7]), the "what" (knew the lawnmowers and general purpose engines were defective), the "when" (at the time it issued the Stop Sale notice), and the "how" (failing to issue a recall) aspects of pleading fraud.  And it is reasonable to assume that Honda had notice of a possible manufacturing defect by the time it issued the Stop Sale notice and devoted resources to an investigation.  The court is nevertheless hesitant to find these allegations sufficient for a claim of fraud.

To the best of the court's understanding, even a company that wishes to initiate a recall as "quickly and efficiently as possible" via the CPSC's Fast Track Recall program—as Honda did, according to the CPSC announcement that Plaintiffs rely on—cannot do so before it is ready to implement a consumer-level recall, including a refund, repair, or replacement program.  In this court's view, manufacturers should be encouraged to freeze the sale and distribution of products they suspect to be defective as early as possible; where the suspected defect is exceptionally dangerous, such an intermediate precaution could prevent serious injuries or even save lives. Exposing manufacturers to fraud claims merely for taking that step before they are prepared to implement a full recall in concert with the CPSC should not be done lightly.

The court need not squarely decide this issue here, however.  Even if the Grahams could properly base their ICFA claim on Honda's failure to issue a full-blown recall at the same time as the Stop Sale notice, it would require yet another leap for the Grahams to plausibly allege that the predicate, fraudulent intent should be imputed to Honda at a time *before* Honda issued the Stop Sale notice on June 19, 2023.  As noted, the Grahams purchased their lawnmower on June 13, 2019.  Assuming they relied on unspecified information contained in Honda's packaging or labeling in making their purchase (which Honda contests), that reliance occurred prior to the date

---

[7]     The court recognizes that Plaintiffs would likely need discovery to access the facts about which Honda employees monitored complaints made to CPSC and decided whether and how to communicate with retail partners and the public about the risk of a defect.  With respect to such facts, the particularity requirement of Rule 9(b) "must be relaxed." *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998).

when, according to Plaintiffs, Honda's failure to correct the record with a recall became fraudulent. Similarly, even if it were proper to attribute representations on Home Depot's website or by a Home Depot store employee to Honda on an agency theory (also contested), the Grahams have not alleged that Home Depot or its employees themselves knew of the defect prior to receiving the Stop Sale notice issued on June 19, 2023.

The Grahams' ICFA claim is dismissed.

### 2. Breach of Implied Warranty of Merchantability

The Grahams allege that Honda breached the implied warranty of merchantability for the lawnmower they purchased. Such a breach occurs where the product is not fit for the ordinary purposes for which such goods are used. *Zwicky v. Freightliner Custom Chassis Corp.*, 373 Ill. App. 3d 135, 146, 867 N.E.2d 527, 536 (2d Dist. 2007) (citation omitted). Under Illinois law, claims for breach of the implied warranty of merchantability are governed by the Uniform Commercial Code ("UCC"). *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 832, 807 N.E.2d 1165, 1168 (1st Dist. 2004).

Here, the Grahams seek economic damages against Honda—but the Grahams purchased their HRN216 lawnmower from a Home Depot store rather than directly from Honda. This is significant because under the UCC, a consumer may ordinarily recover economic damages on a breach of implied warranty theory only against the "immediate seller" of the goods, with whom the consumer is in privity. *Id.* (citations omitted); *see also* 810 ILCS 5/2-314(1) ("a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."). An exception to the privity requirement exists under the third-party beneficiary doctrine, which allows that a plaintiff "may sue under a contract even when not a party to it, provided the benefit of the contract is direct to him, as opposed to being merely incidental." *Barry v. St. Mary's Hosp. Decatur*, 2016 IL App (4th) 150961, ¶ 82, 68 N.E.3d 964, 976 (citation omitted). But there is "a strong presumption against conferring benefits to noncontracting third parties"; in order to overcome the presumption, "the implication that the

contract applies to third parties must be so strong as to be practically an express declaration." *Id.* (citations omitted).

The leading Illinois case on the application of the third-party beneficiary doctrine in cases involving a "remote" manufacturer defendant (i.e., a manufacturer who is not the direct seller) is *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 86 Ill. App. 3d 980, 408 N.E.2d 403 (1st Dist. 1980).[8]  In that case, the court reasoned that privity was not required between a buyer, who had purchased steel tubing from a dealer, and the remote manufacturer of those parts, because "the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Id.* at 992–93, 408 N.E.2d at 412 (citations omitted); *see also Chrysler Corp. v. Haden Uniking Corp.*, No. 91 C 20326, 1992 WL 373039, at *9 (N.D. Ill. Dec. 3, 1992) (no privity required where manufacturer of conveyer system who was not a party to the contract had designed, manufactured, and installed the buyer's conveyor system specifically for the buyer).

Here, the Grahams allege they purchased their lawnmower from a Home Depot store, rather than directly from Honda, and have not suggested theirs was a custom design.  The Grahams contend they may nevertheless recover damages from Honda here for two reasons: (1) that the Grahams were in privity of contract with Honda because Home Depot acted as Honda's agent in selling the lawnmower (Compl. ¶¶ 172–74; Opp. at 6–7); or (2) that the Grahams were the intended third-party beneficiaries of any supply agreement between Honda and Home Depot because Home Depot was not the intended "ultimate consumer" of the lawnmower.  (Compl. ¶ 171; Opp. at 6–7.)  Neither theory has merit.

As Honda points out, courts in this District have repeatedly observed that no Illinois authority permits a plaintiff to "skirt the privity requirement" for implied warranty claims by alleging

---

[8]      Though the decision in *Frank's Maintenance* is nearly 45 years old by now, courts continue to refer to it as a touchstone in this area of Illinois law.  *See, e.g., Bayer HealthCare LLC v. Aeropres Corp.*, 727 F. Supp. 3d 738, 753 (N.D. Ill. 2024); *F.E. Moran, Inc. v. Johnson Controls, Inc.*, 697 F. Supp. 3d 786, 797 (N.D. Ill. 2023).

an agency relationship between the manufacturer and the direct seller. (Mem. at 7 (citing *Jamison v. Summer Infant (USA), Inc.*, 778 F. Supp. 2d 900, 913–14 (N.D. Ill. 2011) and *Zaro v. Maserati N. Am., Inc.*, No. 07 C 3565, 2007 WL 4335431, at *4 (N.D. Ill. Dec. 6, 2007).) Plaintiff's memorandum in opposition to the motion to dismiss presents no case law to the contrary save for *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 704–05 (N.D. Ill. 2016), which Plaintiffs cite for the general proposition that dismissal for lack of privity is often "not appropriate at the motion-to-dismiss stage." (Opp. at 6.) Assuming that is an accurate statement of the law,[9] *Elward* reasons that it is the "fact-intensive nature" of the privity inquiry that would ordinarily counsel against a dismissal on this basis at the pleading stage. *Id.* at 704–05 (quoting *In re L & S Indus., Inc.,* 989 F.2d 929, 932 (7th Cir. 1993)). Here, the Plaintiff's claim would fail even if the court determined that the facts alleged were enough to plead an agency relationship between Honda and Home Depot: the dispositive issue is that the theory of privity-via-agency itself has no basis in law.

The third-party beneficiary argument fares no better. What the Grahams effectively propose is that all purchasers of any mass-produced product are the intended third-party beneficiaries of contracts between the manufacturer and retailers for the supply of the product. The Grahams again offer no authority that would support such a broad application of the third-party theory: they point only to *Frank's Maintenance*, described above, and *R&L Grain Co. v. Chicago E. Corp.*, where the plaintiff had purchased via an intermediary a grain storage bin manufactured by the defendant, and plaintiff alleged that the manufacturer knew that both the intermediary and the plaintiff, specifically, were relying on the manufacturer's "skill or judgment to select and furnish a suitable [bin]." 531 F. Supp. 201, 207 (N.D. Ill. 1981).

---

[9]     *Elward* cites *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993), and *Apex Mgmt. Corp. v. WSR Corp.*, 225 B.R. 640, 646 (N.D. Ill. 1998) for this proposition. *See* 214 F. Supp. 3d at 704–05. But *L & S* and *Apex Mgmt.* discussed privity of interests in the context of a *res judicata* inquiry, rather than privity of contract. *See* 929 F.2d at 932; 225 B.R. at 645. This court finds no controlling authority for the notion that dismissal of a warranty claim for lack of privity is disfavored at the pleading stage.

The court's review of the case law has revealed no support for the Grahams' third-party beneficiary argument either. While the Supreme Court of Illinois held in *Altevogt v. Brinkoetter*—cited by Honda in its reply brief (Reply [29] at 7)—that it is possible for contracting parties to designate a class of people (rather than named individuals) as third party beneficiaries, the Court made clear that plaintiffs claiming such status must nonetheless "allege facts which show an intent" on the part of the contracting parties to confer the benefit of the contract on the class of people, however defined. 85 Ill. 2d 44, 56, 421 N.E.2d 182, 187 (1981).

In *Altevogt*, the plaintiffs alleged defects in the construction of their home and sued both the developer from whom they purchased it and the builder with whom the developer had contracted to do the construction. *Id.* at 47, 421 N.E.2d at 183. Plaintiffs argued that they had standing to sue the builder despite the lack of privity because the builder knew the developer did not intend to live in the house and instead intended that the house would be "held out for sale to unidentified prospective buyers" *Id.* at 52, 56; 421 N.E.2d at 186, 188–89. The *Altevogt* Court affirmed dismissal of the plaintiffs' implied warranty of merchantability claim against the builder. *Id.* at 58, 421 N.E.2d at 188–89. This was not because the plaintiffs were not identified by name as third-party beneficiaries of the construction contract; after all, "a developer who has contracted with a builder to construct houses in a subdivision for sale to members of the general public" might desire "to confer upon some as yet unknown purchaser a right to satisfactory performance by the builder." *Id.* at 56; 421 N.E.2d at 187. Rather, the Court explained, the claim failed because the plaintiffs had not alleged that the developer and contractor *intended* that the eventual purchasers of the home—whoever they were— should have a right to recover against the builder; the mere fact of the builder's alleged "knowledge that a third party would occupy the house" was not enough to support liability. *Id.;* 421 N.E.2d at 188. The *Altevogt* reasoning was applied in the context of consumer products in *Spiegel v. Sharp Elecs. Corp.*, where the court held that defendant's alleged knowledge that the photocopiers it sold to distributors "would be resold to ultimate purchasers" was "legally insufficient" to confer third-party beneficiary status on those ultimate purchasers. 125

Ill. App. 3d 897, 902–03, 466 N.E.2d 1040, 1045 (1st Dist. 1984); *see also Sadler v. Pella Corp.*, 146 F. Supp. 3d 734, 748–49 (D. S.C. 2015) (applying Illinois law and, citing *Altevogt* and *Spiegel*, concluding that defendant window manufacturer's knowledge that its windows would be resold and installed in homes was insufficient to make plaintiff, ultimate purchaser of some such windows, the intended beneficiary of sales contract between the manufacturer and its distributor).

Because they have not alleged Home Depot and Honda *intended* that Home Depot's customers should have a right to sue under any contract between the two, the Grahams' claim for breach of the implied warranty of merchantability is dismissed.

### 3. Breach of Express Warranty

In a breach of express warranty action under the UCC, as incorporated by Illinois law, the plaintiff "must show a breach of an affirmation of fact or promise that was made a part of the basis of the bargain." *Oggi Trattoria & Caffe, Ltd. v. Isuzu Motors Am., Inc.*, 372 Ill. App. 3d 354, 360, 865 N.E.2d 334, 340 (1st Dist. 2007) (citations omitted). "If the goods fail to conform to the affirmations or promises, the seller may be held accountable for breach of warranty." *Weng v. Allison*, 287 Ill. App. 3d 535, 537, 678 N.E.2d 1254, 1256 (3d Dist. 1997).

The Grahams allege that in purchasing their lawnmower, they relied both on unspecified information contained on the lawnmower's packaging or labeling and on a listing for the HRX217 on Home Depot's website representing that the lawnmower was "reliable" and had "easy starting power"; [10] they also say a Home Depot employee told them the lawnmower was reliable and easy

---

[10]    The Plaintiffs' complaint describes other, alleged affirmations made by Honda as well: that Honda's lawnmowers "will give you the best looking lawn on the block," are "so easy to start and reliable, you'll call it 'Old Dependable'," and "make[] the job less of a chore and more of a pleasure." (Compl. ¶ 32; *see supra* at 6.) The Grahams do not allege that they read or heard these statements; as such, the statements cannot have formed a basis of the bargain struck by the Grahams. In any event, these statements appear to be little more than inactionable "puffery" or "puffing": they are "exaggerations reasonably to be expected of a seller as to the degree or quality of his or her product, the truth or falsity of which cannot be precisely determined." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 173, 835 N.E.2d 801, 846 (2005).

to start. These representations, the Grahams assert, were affirmations of fact regarding the quality of the lawnmower, affirmations that were not true of their defective unit.

As with the Grahams' ICFA claims, Honda argues that the Grahams' express warranty claims must fail because the Grahams have failed to specify what information on the packaging or labeling of the lawnmower they relied on and because statements on Home Depot's website or by Home Depot's employees cannot be attributed to Honda. Honda also argues that even if the statements by Home Depot could be attributed to Honda, the statements "comprised only opinion or puffery." (Mem. at 18.) The court agrees that the Grahams cannot plausibly allege that information on the lawnmower's packaging and labeling created an express warranty without explaining what the affirmation of fact or promise was. The lack of specificity in this context robs Honda of notice of the grounds of the Grahams' claim that it is entitled to under Rule 8. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

The court also agrees that the Grahams have not plausibly alleged an agency relationship between Honda and Home Depot that would allow the court to impute statements on Home Depot's website (or by its employees) to Honda. The Supreme Court of Illinois held in *Connick v. Suzuki Motor Co., Ltd.* that allegations that plaintiffs "understood" local Suzuki dealers to be agents of Suzuki were "mere legal conclusions and thus insufficient to plead agency." 174 Ill. 2d 482, 498, 675 N.E.2d 584, 592 (1996). As the Court explained, the term "authorized dealer" means nothing more than a dealer who sells those products. *Id.* (citing *Washington v. Courtesy Motor Sales, Inc.*, 48 Ill.App.2d 380, 383, 199 N.E.2d 263, 265 (1st Dist. 1964)).

The Plaintiffs in this case, including the Grahams, appear to allege that the retailers they purchased their lawnmowers from were agents of Honda simply because the retailers sold Honda products online and in brick and mortar stores, and because the retailers' websites contained information about the Honda products. Tellingly, the Plaintiffs' Opposition to the instant motion fails to identify a single case from Illinois or any other jurisdiction holding that allegations like theirs are sufficient to establish an agency relationship, even at the pleading stage. The alleged

statements made on Home Depot's website and/or by Home Depot employees cannot create an express warranty on the part of Honda.

Thus, to the extent the Grahams' claim for breach of express warranty against Honda relies on Home Depot's communications, it has no traction. Nor is the court persuaded that the Grahams have a basis for recovery based on the lawnmower's purported failure to live up to descriptions of the product online or on its packaging. They may, however, have another basis for this claim: Honda's alleged failure to honor the lawnmower's limited warranty. The warranty confirms that the purchaser is entitled to have a defective lawnmower repaired or replaced by an authorized Honda dealer without charge for parts or labor during the warranty period. The Grahams have plausibly alleged that their lawnmower was defective, that their attempt to have the lawnmower serviced during the warranty period failed to cure the defect, and that Honda thereafter refused to issue a replacement or authorize another round of repairs, leaving the Grahams with an inoperable lawnmower. This is enough to state a claim that Honda failed to honor the repair or replacement remedy of its limited warranty.[11]

### 4.    Unjust Enrichment Claim

To prevail on a claim for unjust enrichment under Illinois law, a plaintiff must show "that the defendant retained a benefit to the plaintiff's detriment and that the retention violates fundamental principles of justice, equity, and good conscience." *Keystone Montessori Sch. v. Vill. of River Forest*, 2021 IL App (1st) 191992, ¶ 98, 187 N.E.3d 1167, 1194 (citation omitted). Importantly, however, unjust enrichment is an equitable remedy based upon a contract implied in

---

[11]    The court notes that Illinois law considers such claims to be ordinary breach of contract claims, rather than breach of express warranty claims, though the difference appears to be immaterial at this time. See *Mydlach v. DaimlerChrysler Corp.*, 226 Ill. 2d 307, 321–23, 875 N.E.2d 1047, 1058–59 (2007) (express warranties relate to the quality of the goods at tender, whereas a repair or replacement remedy in a written warranty "promises only that the manufacturer will repair or replace defective parts during the warranty period"; the statute of limitations for the former begins to run at time of tender, while the statute of limitations for the latter runs at time of breach).

law, available only when no express contract governs the parties' relationship and there is no adequate remedy at law. *Id.* (citation omitted).

In this case, the limited warranty governs the relationship between the Grahams and Defendant, and as described above, the Grahams have a legal remedy available: a breach of express warranty claim. The Grahams' unjust enrichment claim is dismissed.

### B. Konovalov

Plaintiff Alexander Konovalov brings a claim for breach of express warranty under New Jersey law, as well as a claim under the New Jersey Consumer Fraud Act ("NJCFA").

#### 1. Express Warranty Claim

As in Illinois, the UCC controls breach of express warranty claims under New Jersey law. *See Gupta v. Asha Enters., L.L.C.*, 422 N.J. Super. 136, 153, 27 A.3d 953, 963 (App. Div. 2011). The plaintiff must allege that an affirmation of fact or promise by the seller created an express warranty, and that the goods failed to perform as warranted. *Ford Motor Credit Co., LLC v. Mendola*, 427 N.J. Super. 226, 242, 48 A.3d 366, 375 (App. Div. 2012) (citations omitted).

Konovalov alleges that, based on his review of information about his lawnmower on Honda's website, he believed he was buying a high-quality lawnmower that would last a long time—but he fails to identify any particular statement he relied on in forming the bargain. Without more specificity, neither Honda nor the court can assess whether the information allegedly appearing on Honda's website amounted to an affirmation of fact or promise as to the goods rather than, say, puffing. To the extent Konovalov's breach of express warranty claim rests on these grounds, it does not clear the bar of notice pleading created by Rule 8. *See Brooks*, 578 F.3d at 581.

Konovalov also alleges, however, that he suffered damages in spite of availing himself of the repair or replacement remedy offered by Honda. Specifically, he avers that repairing his lawnmower took two tries because a part that Honda sent to his local service dealer, Power Place, to use in the repair ended up causing even more damage to the lawnmower. In the interim,

Konovalov incurred $600 in lawn care expenses during the summer of 2024. These are consequential damages that "naturally flow" from Honda's alleged failure to properly implement the repair or replacement remedy. *Matter of Gloria T. Mann Revocable Tr.*, 468 N.J. Super. 160, 177, 256 A.3d 407, 417 (App. Div. 2021).

Honda's limited warranty disclaims liability for loss of time or use of the product and any consequential damages. And under New Jersey law, where the plaintiff's loss is "commercial" (i.e., not stemming from personal injury) and the product is sold with a limitation of remedy— including limiting the buyer's remedies to repair and replacement of non-conforming goods—the plaintiff is not entitled to relief unless the circumstances caused the limited remedy "to fail of its essential purpose." *Palmucci v. Brunswick Corp.*, 311 N.J. Super. 607, 612–13, 710 A.2d 1045, 1047–48 (App. Div. 1998) (citing N.J.S.A. §§ 12A:2-608, 12A:2-719(2)). But whether an exclusive remedy fails of its essential purpose is a question of fact; a court must examine "the facts and circumstances surrounding the contract, the nature of the basic obligations of the party, the nature of the goods involved, the uniqueness or experimental nature of the items, the general availability of the items, and the good faith and reasonableness of the provision." *BOC Grp., Inc. v. Chevron Chem. Co., LLC*, 359 N.J. Super. 135, 148, 819 A.2d 431, 439 (App. Div. 2003). In the case of a defective product, further considerations include:

> the nature of the defects; the cost and length of time required for repair; whether past repair attempts have been successful; the degree to which the goods can be used while repairs are attempted; the degree to which the goods can be used while repairs are attempted; the degree to and ways in which the buyer is inconvenienced by the nonconformities; and the availability and cost of alternative goods pending repair attempts.

*Palmucci*, 311 N.J. Super. at 615, 710 A.2d at 1048–49 (citation omitted).

Here, Konovalov has alleged that the nonconformity was both inconvenient and potentially dangerous, that his first attempt at having the lawnmower repaired was unsuccessful, and that he could not use his lawnmower while it was in the shop for repairs. That is enough to plausibly allege that the repair or replacement remedy failed of its essential purpose, invalidating the limited

warranty's exclusion of consequential damages and opening an avenue of recovery for Konovalov.

### 2.     NJCFA Claim

That leaves Konovalov's claim under the NJCFA.  That statute requires a private plaintiff—as opposed to the New Jersey Attorney General—to prove three elements: (1) unlawful conduct by defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss.  *D'Agostino v. Maldonado*, 216 N.J. 168, 184, 78 A.3d 527, 536 (2013) (citations omitted).   The NJCFA defines the conduct giving rise to an unlawful practice as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . . [12]

D'Agostino, 216 N.J. at 184, 78 A.3d at 537 (quoting N.J.S.A. § 56:8-2)).   The list above is disjunctive: proof of any one of those acts or omissions will be sufficient to establish unlawful conduct.  *Id.* (quoting *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 19, 647 A.2d 454, 462 (1994)).

As with the Grahams' ICFA claims, the court must decide whether the heightened pleading standard of Rule 9(b) applies to Konovalov's claim under the NJCFA.  There is no question that Rule 9(b) applies to claims under the NJCFA that "sound in fraud."  *Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 489 (D. N.J. 2009) (citations omitted); *see also F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994) (affirming district court's dismissal of defendant's NJCFA and common law fraud counterclaims under Rule 9(b) where defendant failed to assert the identity of speakers who made fraudulent statements).   And as the court has explained, the allegations

---

[12]     Only the Attorney General of New Jersey can bring suit to address unlawful practices that have not been shown to mislead or deceive anyone; the private right of action requires actual damages and causation.  *D'Agostino*, 216 N.J. at 183–84, 78 A.3d at 537.

leveled by Plaintiffs, including Konovalov, regarding Honda's course of conduct in marketing and selling the lawnmowers and engines sound decidedly in fraud. *See supra* at p. 23–24; *see also Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98 n.9 (D. N.J. 2011) (recognizing that some claims under the NJCFA "may not require pleadings complying with Rule 9(b)" but holding that the heightened pleading standard applied where "the gravamen of the claim" was "that the consumer was improperly led to purchase a product because of a false or misleading claim on the part of the seller.")

Konovalov's NJCFA claim fails for the same reasons as the Grahams's ICFA claim. The allegation that Honda knew its lawnmowers were defective before they even went to market does not meet the heightened pleading standard of Rule 9(b). The allegation that Honda knew by June 19, 2023, when it issued the Stop Sale notice to its retail partners, might clear that bar—but Konovalov, like the Grahams, purchased his lawnmower before that date, on May 22, 2023. Konovalov thus cannot show that his damages, such as they are, were caused by the fraudulent conduct.

## CONCLUSION

For the reasons explained above, Honda's motion to dismiss [28] is granted in part and denied in part. The Grahams' and Konovalov's claims for breach express warranties are sustained. The Plaintiffs' remaining claims are dismissed without prejudice. By September 28, 2025, Plaintiffs are directed to advise the court and opposing counsel of their intention, if any, to file an amended complaint.

ENTER:

Dated: September 4, 2025

_____

REBECCA R. PALLMEYER

United States District Judge